# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| C.B.C. DISTRIBUTION AND MARKETING, INC., | ) | |
| | ) | |
|      **Plaintiff/Counter Defendant,** | ) | |
| | ) | |
|      vs. | ) | **Case No. 4:05CV00252MLM** |
| | ) | |
| MAJOR LEAGUE BASEBALL ADVANCED MEDIA, L.P., | ) | |
| | ) | |
|      **Defendant/Counter Claimant,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MAJOR LEAGUE BASEBALL PLAYERS' ASSOCIATION, | ) | |
| | ) | |
|      **Intervenor/Counter Claimant** | ) | |

## MEMORANDUM OPINION

Before the court are the Motion for Summary Judgment filed by Intervenor/Counter Claimant Major League Baseball Players Association (the "Players' Association"), Doc. 44, the Motions for Summary Judgment filed by Plaintiff/Counter Defendant C.B.C. Distribution and Marketing, Inc. ("CBC"), Doc. 72, Doc. 107, and the Motion for Summary Judgment filed by Defendant/Counter Claimant Major League Baseball Advanced Media, L.P., ("Advanced Media"), Doc. 87. The Fantasy Sports Trade Association has filed an Amicus Brief. Doc. 76. The parties have filed Responses and Replies to the various Motions for Summary Judgment.[1] The parties have consented to the

---

[1]     Document 74 is CBC's Response to the Players' Association's Motion for Summary Judgment, Document 44. Document 74 is also a Memorandum in Support of CBC's Motion for Summary Judgment against the Players' Association, Document 72. Document 105 is CBC's Memorandum in Support of its Motion for Summary Judgment against Advanced Media, Document 107. Document 105 is also CBC's Response to Advanced Media's Motion for Summary Judgment, Document 87, and a Reply in support of CBC's Motion for Summary Judgment against the Players' Association, Document 72. Document 111 is the Players'

jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(c)(1). Doc. 13.

# I.
## BACKGROUND AND UNDISPUTED FACTS[2]

The Players' Association is the bargaining representative for Major League baseball players and is comprised of almost all persons who are employed as Major League baseball players. Advanced Media was formed in 2000 by various owners of Major League Baseball teams to serve as the interactive media and internet arm of Major League Baseball. As part of its responsibilities Advanced Media is in charge of running Major League Baseball's internet site, MLB.com.

CBC, which uses the trade name CDM Fantasy Sports, is a Missouri corporation whose primary offices are located in St. Louis, Missouri. CBC markets, distributes and sells fantasy sports products, including fantasy baseball games accessible over the Internet. To date, the business of fantasy sports games is a multimillion dollar industry in the United States.

CBC offers its fantasy sports products via telephone, mail, e-mail, and the Internet through its website, www.CDMsports.com. CBC currently offers eleven fantasy baseball games, two mid-season fantasy baseball games, and one fantasy baseball playoff game. CBC provides lists of Major

_____

Association's Response to the Amicus Brief filed by the Fantasy Sports Trade Association, Document 76. Document 111 is also the Players' Association's Reply in support of its Motion for Summary Judgment against CBC, Document 44, and a Response to CBC's Motion for Summary Judgment against the Players' Association, Document 72. Document 119 is Advanced Media's Response to CBC's Motion for Summary Judgment against Advanced Media, Document 107, and is also Advanced Media's Reply in support of its Motion for Summary Judgment against CBC, Document 87. Document 124 is CBC's Reply in support of its Motion for Summary Judgment against Advanced Media, Document 107.

[2]  The facts as stated above are undisputed unless otherwise stated. The court notes that the parties have filed statements of fact in support of their respective motions for summary judgment and that upon responding to these facts each of the parties has denied the truth of numerous facts. The facts which are disputed, however, are not relevant to this court's determination of the issues before it.

League baseball players for selection by participants in its games. Game participants pay fees to CBC to play its games and pay additional amounts to trade players.[3] Prior to the start of the professional baseball season participants form their teams by "drafting" players from various Major League baseball teams. Participants or "owners" compete against other fantasy owners who have drafted their own teams. The success of one's fantasy team over the course of the baseball season is dependent on one's chosen players' actual performances on their respective actual teams.

In addition to fantasy sports games, CBC's website provides up-to-date information on each player to assist game participants in selecting players for and trading players on their fantasy teams.[4] This information includes information which is typically found in box scores in newspapers such as players' batting averages, at bats, hits, runs, doubles, triples, home runs, etc. See CBC's Ex. 16E, attached hereto. CBC also hires journalists to write stories relevant to fantasy owners, such as the latest injury reports, player profiles, and player reports.

CBC entered into license agreements with the Players' Association covering the period from July 1, 1995, through December 31, 2004 (the "1995 and 2002 License Agreements" or the "Agreements"). Doc. 44, Ex. B1 and B2. The 2002 License Agreement stated that it "represents the entire understanding between the parties and supercedes all previous representations." The court, therefore, need only address the terms of the 2002 License Agreement. The 2002 License Agreement stated that the Players' Association was acting on behalf of all the active baseball players of the National League and the American League who entered into a Commercial Authorization Agreement with the Players' Association; that the Players' Association in this capacity had the right to negotiate

---

[3]     CBC's most popular fantasy baseball game is called Diamond Challenge, in which game customers are charged a transaction fee every time they make a trade.

[4]     One does not have to be a customer of CBC or a game participant to obtain the statistics which CBC provides on its website.

the Agreements and to grant rights in and to the logo, name, and symbol of the Players' Association, identified as the Trademarks, and "the names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data of each player," identified as the "Players' Rights"; and that CBC desired to use the "Rights and/or the Trademarks on or in association with the manufacture, offering for sale, sale, advertising, promotion, and distribution of certain products (the 'Licensed Products')."

The 2002 License Agreement included a no-challenge provision which provided that "during any License Period ... [CBC] will not dispute or attack the title or any rights of Players' Association in and to the Rights and/or the Trademarks or the validity of the license granted." The 2002 License Agreement further stated that upon termination CBC would have no right "... to use in any way the Rights, the Trademarks, or any Promotional Material relating to the Licensed Products" and that upon expiration or termination of the License Agreement, CBC shall "refrain from further use of the Rights and/or the Trademarks or any further reference to them, either directly or indirectly ... ."

Between 2001 and January 2004, Advanced Media offered fantasy baseball games on MLB.com without obtaining a license and without obtaining permission from the Players' Association.

In 2005, Advanced Media entered into an agreement (the "Advanced Media License Agreement") with the Players' Association whereby the Players' Association granted to Advanced Media a license to use "Rights and Trademarks for exploitation via all interactive media," with some exclusions.

On or around January 19, 2005, Advanced Media executive George Kliavkoff sent a request for proposals (the "RFP") to various fantasy game operators and providers including CBC. The RFP invited CBC to submit a proposal under which it would enter into a license agreement with Advanced Media and participate in Advanced Media's fantasy baseball licensing program for the 2005 season.

On February 4, 2005, Advanced Media offered CBC a license to promote Advanced Media's fantasy baseball games on CBC's website in exchange for a percentage share of all related revenue. Doc. 74, Ex. 4N. In particular, Advanced Media stated that it was offering "a full suite of MLB fantasy games" and that CBC could use its "online presence and customer relationships, in conjunction with [Major League Baseball's] marks, to promote the MLB.com fantasy games to [CBC's] customers in exchange for a 10% revenue share from MLB.com on all related revenue." As such, Advanced Media was not offering CBC "a license to promote its own MLB fantasy game for the 2005 season." Doc. 74, Ex. 4N.

On February 7, 2005, CBC filed the Complaint for declaratory judgment in the matter under consideration in which it alleges that it has a reasonable apprehension that it will be sued by Advanced Media if it continues to operate its fantasy baseball games. The Complaint further alleges that Advanced Media has maintained that it has exclusive ownership of statistics associated with players' names and that it can, therefore, preclude all fantasy sports league providers from using this statistical information to provide fantasy baseball games to the consuming public.[5] CBC also seeks injunctive

---

[5]      Count III of CBC's Complaint addressed the right of publicity. CBC also sought declaratory judgment in Count I, pursuant to the Lanham Act, 15 U.S.C. §1051 et seq., in Count II, pursuant to copyright law, and in Count IV, pursuant to state unfair competition or false advertising laws. Advanced Media filed counterclaims alleging violations of state trademark and unfair competition laws, state false advertising laws, and the Lanham Act. The parties have entered into a Stipulation pursuant to which CBC dismissed Counts I, II, and IV of its Complaint and pursuant to which Advanced Media dismissed its counterclaims alleging violations of state trademark and unfair competition laws, state false advertising laws, and the Lanham Act. Doc. 126.

The only count remaining in CBC's Complaint is its allegations regarding the right of publicity which, as discussed below, is a matter of state and common law. Because the federal claims have been dismissed, the court has the discretion to decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). The parties have stipulated that the court can and should retain subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a). Doc. 126. The court has considered that the parties' Stipulation dismissing Counts I, II, and IV comes late in the progress of this case, has considered generally accepted principles of judicial economy,

relief asking that Advanced Media and its affiliates be enjoined from interfering with CBC's business related to sports fantasy teams. Doc. 1.

Advanced Media and the Players' Association, the latter of which intervened in this matter, assert counterclaims, including a contract violation based on the 2002 License Agreement between the Players' Association and CBC. Advanced Media and the Players' Association further assert as a counterclaim that CBC violated the players' right of publicity based on CBC's exploiting the rights of players including their names, nicknames, likenesses, signatures, jersey numbers, pictures, playing records and biographical data (the "Player Rights") via all interactive media with respect to fantasy baseball games. Advanced Media and the Players' Association also seek injunctive relief and exemplary and punitive damages. Doc. 7.

Because the claims and counterclaims asserted in the parties' pleadings and arguments in some, but not all, of the summary judgment briefs are considerably broader than the use of players' names and statistics, the court requested a teleconference with the parties to clarify the precise scope of the matters at issue. On the record, in a teleconference of May 24, 2006, CBC clarified that when it speaks of statistics it is referring to players' names and performance records, also referenced as players' playing records or players' records; "player[s'] names plus their performance records are the only thing[s] at issue in this litigation." Doc. 129 at 6, 9. Additionally, the Players' Association and Advanced Media clarified that they are not claiming that CBC cannot use players' playing records or biographical data; that they are challenging CBC's use of players' names in conjunction with its

convenience and fairness to the litigants, and has determined that the court will retain supplemental jurisdiction over the claims remaining in this matter. The court notes that CBC's affirmative defenses of copyright preemption and the First Amendment do not affect the jurisdictional issue. See Cardtoons, L.C., v. Major League Baseball Players Ass'n, 95 F.3d 959, 964 (10th Cir. 1996) (holding that in a declaratory judgment action "[i]t is the character of the impending action, not the plaintiff's defense, that determines whether there is federal question jurisdiction") (citation omitted).

fantasy baseball games; that they are claiming that the identities of players are represented by their names; that they are concerned with protecting the players' names; and that they are claiming that CBC uses players' names in its fantasy baseball games in violation of the players' right of publicity. Doc. 129 at 8, 13. Also, in the teleconference CBC stated that its position is that players' names and playing records, as used in its fantasy baseball games, are preempted by copyright law; that CBC's use of players' names and playing records in its fantasy baseball games does not violate the players' claimed right of publicity; and that even assuming, arguendo, that CBC's use of players' names and playing records violates the players' right of publicity, the First Amendment controls. Doc. 129 at 6.

Thus, the only remaining issues before this court are whether the players have a right of publicity in their names and playing records as used in CBC's fantasy games; whether, if the players have such a right, CBC has, and is, violating the players' claimed right of publicity; whether, if the players have a right of publicity and if this right has been violated by CBC, such a violation is preempted by copyright law; whether, if the players have a right of publicity which has been violated by CBC, the First Amendment applies and, if so, whether it takes precedence over the players' claimed right of publicity; and whether CBC has breached the 2002 Licensing Agreement.

## II.
## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of the pending motions for summary judgment.

### III.
### APPLICABLE LAW AND DISCUSSION

The court will first determine whether the undisputed facts of this case establish that CBC has violated the players' claimed right of publicity. Only if that right is violated need the court consider whether under the facts of this case federal copyright law preempts the right of publicity and/or whether the First Amendment trumps the right of publicity. See Bonito Boats, Inc. v. Thunder Craft

Boats, Inc., 489 U.S. 141, 161 (1989) (holding that state laws must yield to federal law when the former "pose[s] a substantial threat to [federal law's] ability to accomplish its mission"). Nevertheless, the court will discuss each of the issues raised by the parties.

## A.    Right of Publicity:[6]

The Players' Association and Advanced Media both contend that CBC has violated the players' right of publicity, which right is a creature of state and common law.  See e.g., Zacchini v. Scripps-Howard Broadcasting, Co., 433 U.S. 562, 566 (1977); Doe v. TCI Cablevision, 110 S.W.3d 363 (Mo. 2003) (en banc), cert denied, 540 U.S. 1106 (2004), appeal after remand, 2006 WL 1677856 (Mo. App. E.D. June 20, 2006); Gionfriddo v. Major League Baseball, 94 Ca. App.4th 400, 408 (Cal. Ct. App. 2001).

The right of publicity is recognized by statute and/or common law in many states.[7] J. Thomas McCarthy, The Right of Publicity and Privacy § 63 (2d ed. 2005).   Among those states recognizing the right of publicity is Missouri.  TCI, 110 S.W.3d at 368.[8]  A fairly recent concept, according to the Sixth Circuit in ETW Corporation v. Jireh Publishing, Inc., 332 F.3d 915, 929 (6th Cir. 2003), this

---

[6]    Sources, including case law and treatises, refer to this right as both the "right to publicity" and "the right of publicity." This decision, therefore, reflects such references.

[7]    According to John Grady, Steve McKelvey and Annie Clement, A New Twist for the Home Guys?: An Analysis of the Right of Publicity Versus Parody, 15 J. Legal Aspects of Sport 267, 271 (2005), twenty-eight states recognize the right of publicity.

[8]    In TCI a former professional hockey player known as Tony Twist brought suit regarding a comic book titled Spawn which included a character named "Anthony 'Tony Twist' Twistelli." 110 S.W.3d at 365-66.  The jury found in favor of the real Tony Twist and awarded him $24.5 million dollars.  The trial court entered a judgment notwithstanding the verdict on the grounds that Twist had not made a submissible case. On appeal, the Missouri Supreme Court concluded that Twist had in fact made a submissible case. The court, however, remanded the matter based on an instructional error.  Upon retrial, the jury awarded Twist $15 million dollars. The defendants filed an appeal asserting, among other things, that their use of Twist's name was protected speech under the First Amendment.  The Missouri Court of Appeals, Eastern District affirmed the judgment of the trial court.  Doe v. McFarlane, 2006 WL 1677856 (Mo. Ct. App. June 20, 2006).

right "was first recognized in <u>Haelan Laboratories, Inc. v. Topps Chewing Gum. Inc.</u>, 202 F.2d 866 (2nd Cir. 1953), where the Second Circuit held that New York's common law protected a baseball player's right in the publicity value of his photograph, and, in the process, coined the phrase 'right of publicity' as the name of this right."  Subsequently, in <u>Zacchini</u>, 433 U.S. at 573, where a performer in a "human cannonball" act sought to recover damages from a television broadcast of his entire performance, the Supreme Court recognized that the right of publicity protects the proprietary interest of an individual to "reap the reward of his endeavors."

The right of publicity is described in Section 46 of the Restatement (Third) of Unfair Competition (2005), Appropriation of the Commercial Value of a Person's Identity: The Right of Publicity. This Restatement provision states that "[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability ... ."  Relying on the Restatement, the Missouri Supreme Court held in <u>TCI</u>, 110 S.W.3d at 369, that "the elements of a right of publicity action include: (1) That defendant used plaintiff's name as a symbol of his identity (2) without consent (3) and with the intent to obtain a commercial advantage." <u>See</u> <u>also</u> <u>Gionfriddo</u>, 94 Cal. App.4th at 409 ("The elements of [the tort of the right of publicity], at common law, are: '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'"). To prove a violation of one's right of publicity a plaintiff must establish that the defendant commercially exploited the plaintiff's identity without the plaintiff's consent to obtain a commercial advantage. <u>Carson v. Here's Johnny Portable Toilets, Inc.</u>, 698 F.2d 831, 835 (6th Cir. 1983).  Thus, the court will proceed to determine whether the elements of the right of publicity are present in the matter under consideration.

## 1. Commercial Advantage Element of the Right of Publicity:

It is undisputed that CBC is using the players' names and playing records without the consent of the players. As such, the court must consider whether CBC's use of players' names in conjunction with their playing records in its fantasy baseball games utilizes the players' names as a symbol of their identities to obtain a commercial advantage and, if so, whether there is resulting injury.

In regard to the commercial advantage element of the right of publicity, "it is *irrelevant* whether [a] defendant *intended to injure* the plaintiff." TCI, 110 S.W.3d at 371 (citing McCarthy, Rights of Publicity, § 3.28) (emphasis added). The *intent* must be *to obtain a commercial advantage*. Id. See also Carson, 698 F.2d at 837 ("[U]nder the existing authorities, a celebrity's legal right of publicity is invaded whenever his identity is intentionally appropriated for commercial purposes."). Evidence which shows that a defendant *intended to create an impression* that a *plaintiff is associated* with the defendant's product "alone is sufficient to establish the commercial advantage element in a right of publicity action." TCI, 110 S.W.3d at 371 (citations omitted). Additionally, using a plaintiff's name "to attract attention to [a] product" is evidence supporting a conclusion that a defendant sought to obtain a commercial advantage. Id. at 372.[9] For example, in Henley v. Dillard

---

[9]    Use of a plaintiff's name, however, must be more than "incidental" to violate the right of publicity. TCI, 110 S.W.3d at 375 (holding that when a plaintiff's name and identity are used without intent to obtain a commercial advantage but where they are used for some other purpose, the use is incidental and does not violate the right of publicity). The court in Henley, 46 F. Supp.2d at 594 n.6, provided the following examples of incidental use:

> "Incidental use" was found where a motion picture showed a factory building upon which there was a sign bearing the name and business of the plaintiff. Merle v. Sociological Research Film Corp., 166 A.D. 376, 152 N.Y.S. 829 (1 Dept. 1915)). The court held that no violation of the New York statute had taken place, since in order to constitute such a violation, it must appear that the use of plaintiff's picture or name is itself for the purpose of trade and is not merely an incidental part of a photograph of an actual building.

> The court in Moglen v. Varsity Pajamas, Inc., found an "incidental use"

Department Stores, where it was uncontroverted that the defendant intended to use the plaintiff's name to make an advertisement "more interesting," the court found the requisite intent to use for commercial advantage. 46 F. Supp.2d 587, 592-93 (N.D. Tex. 1999) ("[The defendant] intended for [potential customers] to associate the expression 'Don's henley' with the Plaintiff Don Henley. Furthermore, ... the ad's designer, admitted that she believed the expression Don's henley would catch the consumers' eye because of its similarity to the name 'Don Henley.'"). See also Abdul-Jabbar v. Gen. Motors, 85 F.3d 407, 415-16 (9th Cir. 1996) (quoting Eastwood v. Superior Court for Los Angeles County, 149 Cal. App.3d 409, 198 Cal. Rptr. 342, 349 (1983) (finding a violation of the right of publicity where the defendant used "the plaintiff's birth name [to] attract[] television viewers' attention.").

Unlike cases where the commercial advantage element of the right of publicity has been found, there is nothing about CBC's fantasy games which suggests that any Major League baseball player is associated with CBC's games or that any player endorses or sponsors the games in any way. The use of names and playing records of Major League baseball players in CBC's games, moreover, is not intended to attract customers away from any other fantasy game provider because all fantasy game providers necessarily use names and playing records. Indeed, there is no evidence to create a triable issue as to whether CBC intended to create an impression that Major League baseball players are associated with its fantasy baseball games or as to whether a reasonable person would be under the

---

where a newspaper article reporting plaintiff's loss of a tennis match was partly reproduced, together with other articles, as a patchwork pattern in a fabric which defendants manufactured and sold for use in underwear, pajamas, and play togs. The court held that such use did not meet the requirement of a meaningful or purposeful use of a name, since the pattern of the newspaper page as a patch in the fabric was only incidental to the design of the fabric and the appearance of plaintiff's name in the article was an even more casual and incidental use. 13 A.D.2d 114, 213 N.Y.S.2d 999 (1 Dept. 1961).

impression that the baseball players are associated with CBC's fantasy games any more than the players are associated with a newspaper boxscore. As such, there is no triable issue of fact as to whether CBC uses Major League baseball players' names in its fantasy baseball games with the intent of obtaining a commercial advantage.

In regard to the commercial advantage element of the right to publicity and relying on <u>Palmer v. Schonhorn Enterprises, Inc.</u>, 232 A.2d 458 (N.J. Super. 1967), the Players' Association and Advanced Media seek to draw analogy of the matter under consideration to use of a famous person's picture in a board game. As do the baseball players in the matter under consideration, the golfers in <u>Palmer</u> contended that "the use of their respective names reduce[d] their ability to obtain satisfactory commercial affiliation by licensing agreements." <u>Id</u>. at 459. Upon finding in favor of the golfers, however, the court in <u>Palmer</u> *relied upon the defendant's use of the golfers' pictures* and cited cases wherein recovery was permitted for an *invasion of privacy*[10] where a picture of a famous person was used. <u>Id.</u> at 461 ("Where defendant sold lockets with removable *photographs* of plaintiff in each one, it was held that plaintiff-actress could recover for this invasion of her privacy.") (emphasis added) (citing <u>Lane v. F. W. Woolworth Co.</u>,11 N.Y.S.2d 199 (S.Ct.1939); ("Where defendant inserted *pictures* of plaintiffs, widely known baseball players, in containers of popcorn and chewing gum, recovery was permitted.") (emphasis added) (citing <u>Jansen v. Hilo Packing Co.</u>,118 N.Y.S.2d 162 (S.Ct.1952); ("Where defendant inserted a *picture* of a motion picture actress using a certain camera, with an inscription beneath it giving her name, in a manual for the use of such camera, she was permitted a recovery.") (emphasis added) (citing <u>Selsman v. Universal Photo Books, Inc.</u>, 238 N.Y.S.2d 686 (App. Div.1963)).

---

[10]     The court in <u>Palmer</u>, 232 A.2d at 461, did not consider the right of publicity per se. Rather, the court in <u>Palmer</u>, 232 A.2d at 459, made it clear that the issue before it was whether the defendant was violating the plaintiff's right of privacy.

To the extent that <u>Palmer</u> involved the unauthorized use of professional golfers' names and playing records in the defendant's board games, the court acknowledges that <u>Palmer</u> has certain factual similarities to the matter under consideration, but with the critical exception that the defendant in <u>Palmer</u> used golfers' *pictures*; there is no allegation in the matter under consideration that CBC uses baseball players' pictures in conjunction with its fantasy baseball games; rather, the contention is that CBC uses players names in conjunction with their playing records. Indeed, cases, including <u>Palmer</u>, which address unauthorized use of a famous person's picture are distinguishable from CBC's use of baseball players' names and playing records and, therefore, do not suggest that CBC is using players' names and/or playing records to obtain a commercial advantage. Unlike cases where there was an appropriation of a *likeness* to create the impression that a famous person endorsed a product, CBC's use of players' names in no way creates an impression that players endorse CBC's fantasy games. <u>See</u> <u>e.g.</u>, <u>Abdul-Jabbar</u>, 85 F.3d 407 (holding that use of a basketball star's former name in conjunction with his *likeness* could be construed as his endorsement of a product); <u>Cardtoons, L.C. v. Major League Baseball Players' Ass'n,</u> 95 F.3d 959, 968 (10th Cir. 1996) (holding that the defendant's use of players' *likenesses* in parody trading cards violated the right of publicity)[11]; <u>Toney v. L'Oreal USA</u>, 406 F.3d 905, 910 (7th Cir. 2005) (holding that the defendant's use of a model's *likeness* in connection with the packaging and promotion of its hair care product violated the right of publicity); <u>Newcombe v. Adolf Coors Co.</u>, 157 F.3d 686, 692-93 (9th Cir. 1998) (finding a "triable issue of fact" as to whether the plaintiff was "readily identifiable as the pitcher in [an] advertisement" and "whether the advertisement made use of [the plaintiff's] *likeness*").

---

[11]     Ultimately, as set forth below, the court in <u>Cardtoons</u>, 95 F.3d at 976, found that although the right of publicity was violated the First Amendment prevailed.

Most significantly <u>Palmer</u> was decided in 1967 and is inconsistent with more recent case authority including the Supreme Court's decision in <u>Zacchini</u>.[12] <u>Palmer</u> does not accurately reflect the concept of the right of publicity as articulated by the courts of various jurisdictions including the Supreme Court and, therefore, is not controlling in this matter.[13] In this regard, the court in <u>Palmer,</u> 232 A.2d. at 460, acknowledged that, at the time of the decision, recognition of the right of privacy itself was a relatively new concept.

The court finds, therefore, for the reasons fully set forth above that the undisputed facts establish that the commercial advantage element of the right of publicity is not met in the matter under consideration.

## 2. Identity Element of the Right of Publicity:

It remains to be determined in regard to the elements of the right of publicity whether CBC has, and is, using the players' names "as a symbol of their identity." One's persona is most significant

---

[12] The Players' Association and Advanced Media also rely upon <u>Uhlaender v. Henricksen</u>, 316 F. Supp. 1277 (D. Minn. 1970), which case involved the defendant's use of baseball players' names, uniform numbers and statistical information in its board games. The baseball players in <u>Uhlaender</u>, as do baseball players in the matter under consideration, alleged that the defendant engaged in "'misappropriation and use for commercial profit of the names of professional major league baseball players without the payment of royalties.'" <u>Id.</u> 1279 (quoting the Complaint). The court in <u>Ulhaender</u> found that the defendants engaged in the unauthorized appropriation of the players' "names and statistics for commercial use" and that, therefore, the baseball players were entitled to relief. <u>Id.</u> at 1283. Like <u>Palmer</u>, <u>Uhlaender</u> was decided early in the development of the recognition of the common law right of publicity and is inconsistent with more recent case authority including the Supreme Court's decision in <u>Zacchini</u>. As such, <u>Uhlaender</u> is not controlling.

[13] The court in <u>Palmer</u> failed to consider the element of the right of publicity which requires that a defendant use a plaintiff's identity or persona. More recent authority reflects that use of a person's identity or persona is a critical element in establishing a right to recovery under a right of publicity theory. <u>See</u> <u>e.g.</u>, <u>Cardtoons</u>, 95 F.3d at 968; <u>Carson,</u> 598 F.2d at 835; <u>Henley</u>, 46 F. Supp.2d at 597; <u>TCI</u>, 110 S.W.3d at 369, 372; <u>Gionfriddo</u>, 94 Cal. App.4th at 409.

in a right of publicity cause of action.  <u>Carson</u>, 698 F.2d at 835 ("The right of publicity has developed to protect the commercial interest of celebrities in their *identities.*") (emphasis added); <u>Rosemont Enterprises, Inc. v. Urban Sys., Inc.</u>, 340 N.Y.S.2d 144, 146 (Sup. Ct. 1973) ("There is no question but that a celebrity has a legitimate proprietary interest in his public *personality.*") (emphasis added); <u>Ali v. Playgirl, Inc.</u>, 447 F. Supp. 723, 728 (S.D.N.Y. 1978) ("The distinctive aspect of the common law right of publicity is that it ... protects [a prominent person's] proprietary interest in the profitability of his public reputation or '*persona.*'") (emphasis added).

To resolve the issue of whether a public personality's name is used as a *symbol of his or her identity*, it is appropriate to consider "'the nature and extent of the identifying characteristics used by the defendant, the defendant's intent, the fame of the plaintiff, evidence of actual identification made by third persons, and surveys or other evidence indicating the perceptions of the audience.'" <u>TCI</u>, 110 S.W.3d at 370 (quoting Restatement (Third) of Unfair Competition, § 46 cmt. d.).  For example, in <u>TCI</u>, upon determining whether the defendant used, in a comic book, plaintiff Tony Twist's name as a symbol of his identity, the court in <u>TCI</u> considered the real Tony Twist's fame as a star in the National Hockey League, the nature and extent of the identifying characteristics used by the defendant, and their similarity to those characteristics in the public persona of the real Tony Twist including the "common persona of a tough-guy 'enforcer.'"[14] <u>Id.</u>  The court also considered that it was the intent of the defendant to draw attention to those similarities.[15]  As such, the court in <u>TCI</u>

---

[14]    The court in <u>TCI</u>, 110 S.W.3d at 366, noted that the defendant's comic book character was "villainous" and that the real life Tony Twist "had a reputation as a tough-guy 'enforcer' and perhaps because of that reputation, Twist was immensely popular with the hometown fans.  He endorsed products, appeared on the radio and television, hosted the 'Tony Twist' television talk show for two years, and became actively involved with several children's charities."

[15]    The Missouri Supreme Court considered in <u>TCI</u>,110 S.W.2d at 375, that a verdict director erroneously "omitted any requirement that the jury find that defendant used plaintiff's

concluded that "the evidence supported a finding that [the defendants] used Twist's *name **and** identity* 'with the intent to obtain a commercial advantage.'" Id. at 375 (emphasis added).[16] Thus, upon determining whether there is a violation of the right of publicity in the matter under consideration, how players' names are used is significant rather than the mere fact that they are used. Id. at 369.

Indeed, not all uses of another's name are tortious; mere use of a name as a name is not tortious. Id. Rather, a name must be used as a *symbol of* the plaintiff's *identity* in a right of publicity action. Id. See also Carson, 698 F.2d at 835 [17] ("If the celebrity's *identity* is commercially exploited, there has been an invasion of his right whether or not his "name or likeness" is used. Carson's identity may be exploited even if his name, John W. Carson, or his picture is not used."). As such, CBC's mere use of Major League baseball players' names in conjunction with their playing records does not establish a violation of the players' right of publicity. CBC's use of the baseball players' names and

---

identity rather than merely his name." However, because the evidence "so clearly established that [] Tony Twist was the basis for the [comic book] character's name," the court found that this omission did not prejudice the defendants. Id. This finding in TCI further emphasizes that according to the Missouri Supreme Court mere use of a name is not enough to establish a violation of the right of publicity; identity is a critical element of the right of publicity.

[16]     The court in TCI,110 S.W.2d at 375, set aside the jury's verdict in favor of the plaintiff, the real Tony Twist, however, because the verdict director improperly instructed the jury in regard to the commercial advantage element of the right of publicity. The verdict director did not require the jury to find that the defendants used the "plaintiff's name 'with the intent to derive' or 'for  the purpose of deriving' a[] [commercial] advantage." Id. Thus, the jury could have found the defendant liable "based on the mere incidental result of the use rather than the intentional result" to derive a commercial advantage. Id.

[17]     In Carson, 698 F.2d 831, it was alleged that the defendant violated the right of privacy by using the phrase "Here's Johnny" as a corporate name and in conjunction with the sale and rental of portable toilets.  The defendant also used the phrase "The World's Foremost Commodian" in the marketing of its product.  The name and picture of Johnny Carson, a comedian and the host of a nightly television show, who used "Here's Johnny" as an introductory slogan on his nightly television show, had been licensed to an apparel company and to men's toiletries company.  Johnny Carson and the apparel company brought suit against the defendant.

playing records in the circumstances of this case, moreover, does not involve the character, personality, reputation, or physical appearance of the players; it simply involves historical facts about the baseball players such as their batting averages, home runs, doubles, triples, etc. CBC's use of players' names in conjunction with their playing records, therefore, does not involve the persona or identity of any player. See id.; TCI, 110 S.W.3d at 369-70. Indeed, under the facts of this case there is no triable issue as to whether the persona or identity element of the right of publicity is present.

For the reasons fully set forth above, the court concludes that the undisputed facts establish that CBC does not use in its fantasy baseball games Major League baseball players' names separately or in conjunction with their playing records as a symbol of their identity; that CBC does not use players' names separately or in conjunction with their playing records with the intent to obtain a commercial advantage; and that, therefore, the elements of the right of publicity are not present in the matter under consideration. See Zacchini, 433 U.S. at 573; TCI, 110 S.W.3d at 368-69; Gionfriddo, 94 Cal. App.4th at 413.[18]

### 3. Policy Considerations Applicable to the Right of Publicity:

Next the court will address policy considerations behind the right of publicity to determine whether CBC's use of players' names in conjunction with their playing records in its fantasy baseball games contravenes these policies. The Restatement (Third) of Unfair Competition § 46, Cmt. c (2005), states that the justification for the right of publicity includes: (1) protection of "an individual's interest in personal dignity and autonomy"; (2) "secur[ing] for plaintiffs the commercial value of their

---

[18] To the extent that resulting injury is an element of the right of publicity the court need not address this element as it has found that the other elements are not present. See Gionfriddo v. Major League Baseball, 94 Cal. App.4th 400, 409 (Cal. Ct. App. 2001). However, in addressing the policy reasons behind the right of publicity the court finds below that players have not been damaged.

fame"; (3) prevent[ing] the unjust enrichment of others seeking to appropriate" the commercial value

of plaintiffs' fame for themselves; (4) preventing harmful or excessive commercial use that may dilute

the value of [a person's] identity"; and (5) "afford[ing] protection against false suggestions or

endorsement or sponsorship." "The right to publicity protects the ability of public personae to

control the types of publicity that they receive. The right to publicity protects pecuniary, not

emotional, interests." [19] Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir. 1995) (citing

Uhlaender v. Henricksen, 316 F. Supp. 1277, 1280-81 (D. Minn.1970)). See also J. Thomas

McCarthy, The Rights of Publicity and Privacy § 1:4 at 3 (2d ed. 2005) ("[T]he right of publicity is

the inherent right of every human being to control the commercial use of his or her identity."). The

right of publicity "protect[s] a person from losing the benefit of their [sic] work in creating a publicly

recognizable persona.'" TCI, 110 S.W.3d at 368 (quoting Bear Foot, Inc. v. Chandler, 965 S.W.2d

386, 389 (Mo. Ct. App.1998)). "'[T]he right of publicity protects against commercial loss caused by

appropriation of an individual's [identity] for commercial exploitation.'" Id. (quoting 4 J. Thomas

McCarthy, McCarthy on Trademarks and Unfair Competition § 28.6 (4th ed. 2003)). This right

protects a public figure's right to receive pecuniary gain for the commercial use of his or her likeness.

Haelan Labs., 202 F.2d at 868 ("[I]t is common knowledge that many prominent persons (especially

actors and ball-players), far from having their feelings bruised through public exposure of their

likenesses, would feel sorely deprived if they no longer received money for authorizing

---

[19]     See e.g., Motschenbacher v. R.J. Reynolds Tobacco Co., 498 F.2d 821, 824 (9th
Cir. 1974) (applying the right of publicity to a professional race car driver); Ali v. Playgirl, Inc.,
447 F. Supp. 723 (S.D.N.Y. 1978) (applying the right of publicity to a professional boxer);
Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 413 (9th Cir.) (applying the right of publicity to
a professional basketball player); Grant v. Esquire, Inc., 367 F. Supp. 876 (S.D.N.Y. 1973)
(applying the right of publicity to an actor).

advertisements, popularizing their countenances, displayed in newspapers, magazines, buses, trains and subways.").

Upon finding in favor of the performer/plaintiff the Supreme Court concluded in <u>Zacchini</u>, in regard to the purpose of the right of publicity, that:

> "The rationale for (protecting the right of publicity) is the straightforward one of *preventing unjust enrichment* by the theft of good will. No social purpose is served by having the defendant get free some aspect of [the performer] that would have market value and *for which he would normally pay*." (citation omitted). Moreover, the broadcast of [the performer's] entire performance, unlike the unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, *goes to the heart of [the performer's] ability to earn a living as an entertainer.*

433 U.S. at 576 (emphasis added). <u>See</u> <u>also</u> <u>Carson</u>, 698 F.2d at 837 ("Vindication of the right [of publicity] will also tend to prevent unjust enrichment by persons ... who seek commercially to exploit the identity of celebrities without their consent.").

All of the above the policy considerations are aimed at preventing harmful or excessive commercial use of one's celebrity in a manner which could dilute the value of a person's identity. <u>See</u> <u>Zacchini</u>, 433 U.S. at 576; <u>Ventura</u>, 65 F.3d at 730; <u>Carson</u>, 698 F.2d at 837; <u>TCI</u>, 110 S.W.3d at 368. However, CBC's use of Major League baseball players' names and playing records in fantasy baseball games does not go to the heart of the players' ability to earn a living as baseball players; the baseball players earn a living playing baseball and endorsing products; they do not earn a living by the publication of their playing records.[20] <u>See</u> <u>Zacchini</u>, 433 U.S. at 576. Moreover, CBC's use of Major League baseball players' names and playing records does not give CBC something free for which it

---

[20]    While not relying on these reports, the court notes that expert reports in the matter under consideration suggest that, in fact, fantasy sports games increase the commercial value of players' identities because the games encourage participants to attend live games, pay for television packages, or watch on television sporting events in which they otherwise would not be interested. <u>See</u> e.g., Saunders Expert Report ¶ ¶ 11-20; Thomas Decl. ¶ ¶10.

would otherwise be required to pay; players' records are readily available in the public domain.  See id.

In fact, case law suggests that CBC's use of the names and playing records of Major League baseball players in the circumstances of this case actually enhances the marketability of the players. The plaintiffs in Gionfriddo, 94 Cal. App.4th at 413, who were baseball players themselves, argued that the baseball clubs used players' "information ... to *increase interest in baseball*, with the belief that this would increase attendance at games." (emphasis added). Additionally, the court concluded in Gionfriddo that "the challenged uses [which] involve[d] statements of historical fact, descriptions of these facts or video depictions of them," would "likely" "enhance[]" the players' marketability. Id. at 415.  As such, it cannot be said that CBC's use of the Major League baseball players' names and playing records in the circumstances of this case deprives the players of their proprietary interest in reaping the reward of their endeavors.  See Zacchini, 433 U.S. at 573, 575-76. The court finds, therefore, for the reasons fully set forth above that the undisputed facts establish that CBC's use of players' names and/or playing records in its fantasy baseball games does not contravene the policies behind the right of publicity.

In summary, the court finds that the undisputed facts establish that CBC does not use in its fantasy baseball games Major League baseball players' names separately or in conjunction with their playing records as a symbol of their identity; that CBC does not use players' names separately or in conjunction with their playing records with the intent to obtain a commercial advantage; that CBC's use of players' names separately or in conjunction with their playing records does not contravene the policy behind the right of publicity;  and that, therefore, CBC has not and is not violating the players' claimed right of publicity. See id. at 573; TCI, 110 S.W.3d at 368-69; Gionfriddo, 94 Cal. App.4th at 409.

However, in order to address all the issues raised by the parties, the court will assume, arguendo, that the right of publicity of the Major League baseball players is violated under the circumstances of the matter under consideration. The court will, therefore, consider whether the First Amendment prevails over the players' claimed right of publicity and whether copyright law preempts this right.

**B.      The First Amendment:**

CBC argues, in the event it has violated the players' right of publicity, that speech is involved in its fantasy games; that this speech does not differ from raw statistics published in newspapers; that the speech involved in its fantasy games is expression which is protected under the First Amendment; and that the First Amendment trumps the right of publicity in the circumstances of this case. The Players' Association and Advanced Media argue that CBC's games do not involve speech or the expression of ideas; that what is at issue in this matter is not speech; and that, therefore, the First Amendment does not apply.[21]

**1.   Applicability of the First Amendment to the Right of Publicity:**

The court will first consider whether the First Amendment right of expression is applicable to CBC's fantasy baseball games. In Zacchini, 433 U.S. at 567, the Supreme Court recognized that

---

[21]      In New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964), the Supreme Court articulated the requirement that for the First Amendment to apply there must be state action. (holding that while "[t]he Fourteenth Amendment is directed against State action and not private action," the state action requirement is met in a civil action where state law is applied, whether by statute or common law). See also Cardtoons, 95 F.3d at 968 (holding that the state action requirement for the applicability of the First Amendment is met where it is alleged that a state statute allegedly restricts the right of free expression). The parties do not refute the presence of the requisite state action. In any case, the state action requirement is met in the matter under consideration because the parties seek to apply a state rule of law, the right of publicity, which rule of law is alleged to restrict freedom of expression. New York Times, 376 U.S. at 265.

First Amendment principles can be applicable where the right of publicity is claimed. As such, it must be determined whether the First Amendment is applicable in the circumstances of the matter before this court.

a.  Application of the First Amendment to Less Traditional Forms of Expression:

Speech which does not use "a traditional medium of expression" does not receive less protection that more traditional means of speech. Cardtoons, 95 F.3d at 969. As such, the First Amendment has been applied to flag burning, nude dancing, and wearing a jacket with obscenities. Id. (citations omitted). Moreover, the fact that expression appears in a novel medium does not preclude its being subject to First Amendment protection. Interactive Digital Software Association v. St. Louis County, 329 F.3d 954, 957 (8th Cir. 2003). Thus, to the extent that it can be said that CBC's use of the names and playing records of Major League baseball players on a website is not traditional, this non-traditional expression is not precluded from First Amendment protection.

b.  Application of the First Amendment to Factual Data and History:

Courts have found that First Amendment freedom of expression is applicable in cases where the subject matter at issue involved *factual data and historical facts*. For example, in Gionfriddo, 94 Cal. App.4th at 410, the court concluded that the "precise information conveyed ... consist[ed] of factual data concerning [baseball] players [and] their performance statistics" and that, as such the First Amendment was applicable.[22] The California court in Gionfriddo characterized the information conveyed by the defendant as "mere bits of baseball's history." Id. Significantly, the California court further held that the First Amendment protects "recitations of [baseball] players' accomplishments.

---

[22]    In Gionfriddo, 94 Cal. App.4th at 405, 410, retired baseball players challenged the use of their performance statistics, photographs, and verbal and video descriptions of their play in violation of their statutory and common law right of publicity by the defendants who included the Major League Baseball Clubs and their agent for purposes of use of the Club's trademarks.

'The freedom of the press is constitutionally guaranteed, and the publication of daily news is an acceptable and necessary function in the life of the community.' (citations omitted). 'Certainly, the accomplishments ... of those who have achieved a marked reputation or notoriety by appearing before the public such as ... *professional athletes* ... may legitimately be mentioned and discussed in print or on radio and television.'" Id. (citation omitted) (emphasis in original). See also Cardtoons, 95 F.3d at 968 (holding that because the defendant's parody baseball cards disseminated information the trading cards were entitled to full First Amendment protection).

Indeed, the manner in which CBC uses the names and playing records of Major League Baseball players in the context of its fantasy baseball games represents the accomplishments of Major League baseball players. The names and playing records of the baseball players as used by CBC are, in fact, "bits of baseball history" which educate the public about baseball. Most importantly, the statistical information about Major League baseball players, including their hits, runs, doubles, etc., which CBC disseminates, represents historical facts about baseball players. See CBC's Ex. 16E, attached hereto; Cardtoons, 95 F.3d at 969, Gionfriddo, 94 Cal. App.4th at 410.

c.  Application of the First Amendment in the Context of Profit:

A defendant's *making a profit* does not preclude its receiving First Amendment protection. Time Inc. v. Hill, 385 U.S. 374, 396-97 (1967) ("'That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.'") (citations omitted). See also ETW, 332 F.3d at 924 ("Speech is protected even though it is carried in a form that is sold for profit.") (citations omitted) and ("The fact that expressive materials are sold does not diminish the degree of protection to which they are entitled under the First Amendment") (citing City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 756 n.5 (1988)). The court finds, therefore, that CBC's deriving a profit from its use

of the names and playing records of Major League baseball players in its fantasy baseball games does not preclude such use from having First Amendment protection.

    d.  <u>Application of the First Amendment in the Context of Expression that Entertains:</u>

The First Amendment has been applied in the context of the right of publicity where the expression at issue *entertains*. <u>Cardtoons</u>, 95 F.3d at 969; <u>Gionfriddo</u>, 94 Cal. App.4th at 410. This rationale is applied because "the public interest is not limited to current events; the public is also entitled to be informed and *entertained about [] history*." <u>Id.</u> (citation omitted) (emphasis added). Indeed, "entertainment itself can be important news"; "[e]ntertainment features receive the same constitutional protection as factual news reports." <u>Id.</u> (citing <u>Zacchini</u>, 433 U.S. at 578) (other citations omitted). The fact that the social commentary is humorous, rather than serious, does not preclude First Amendment protection. <u>Cardtoons</u>, 95 F.3d at 969 ("Speech that entertains, like speech that informs, is protected under the First Amendment because '[t]he line between the informing and the entertaining is too elusive for the protection of that basic right.'") (quoting <u>Winters v. New York</u>, 333 U.S. 507, 510 (1948) and (citing <u>Zacchini</u>, 433 U.S. at 578). Additionally, "'[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the ... importance of the ideas seeking expression.'" <u>Time</u>, 385 U.S. at 388 (quoting <u>Bridges v. California</u>, 314 U.S. 252, 269 (1941)). Clearly, CBC's use of the names and playing records of Major League baseball players is meant to entertain game participants and persons using CBC's website. The court finds that this characterization, however, does not preclude CBC's use of players' names and playing records from receiving First Amendment protection. <u>See</u> <u>Cardtoons</u>, 95 F.3d at 968; <u>Gionfriddo</u>, 94 Cal. App.4th at 410.

    e.  <u>Application of the First Amendment in the Context of Interactive Expression:</u>

Expression is not disqualified from First Amendment protection because it is *interactive*. Interactive Digital Software, 329 F.3d at 957. Thus, "the breadth of the First Amendment" has been extended to "pictures, graphic design, concept art, sounds, music, stories, and narrative present in video games." Id. The First Amendment is applicable to interactive expression because "literature is most successful when it 'draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own.'" Id. (quoting Am. Amusement Mach. Ass'n v. Kendrick , 244 F.3d 572, 577 (8th Cir. 2003)). As such, to the extent that CBC's use of the names and playing records of Major League baseball players in the circumstances of this case involves interaction among game participants and between game participants and CBC's website, such interaction does not preclude such use from being protected under the First Amendment.

      f.   Application of the First Amendment to Commercial Speech:

The Players' Association suggests, to the extent expression is involved in the matter under consideration, that such expression is actually commercial speech and that it is, therefore, not protected under the First Amendment. Doc. 111 at 20.

"Commercial speech is best understood as speech that merely advertises a product or service for business purposes." Cardtoons, 95 F.3d at 970 (citation omitted). "The Supreme Court has defined commercial speech as 'expression related solely to the economic interests of the speaker and its audience.'" Id. (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980)). Expression, however, is not commercial speech if it does not advertise another unrelated product, and speech is not transformed into commercial speech merely because the product

at issue is sold for profit. Id. (citing Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761 (1976)). [23]

In the context of the matter under consideration, CBC communicates information about Major League baseball players; CBC does not use players' names and playing records for the purpose of advertising a product or services. As such, the court finds that CBC's use of the players' names and playing records is not commercial speech. Id. at 970.

In summary and for the reasons fully set forth above, the court finds that the players' records which CBC provides are available to the public at large by watching games and are disseminated to the public in newspapers and by statistics providers; CBC uses players' names to convey information, the players' records, which information is already in the public domain. See Ex.16 E; Interactive Digital Software, 329 F.3d at 954. CBC's website encourages game participants to learn about players' playing records and can be said to provide an education in baseball. See Cardtoons, 95 F.3d at 968-69. Further, CBC's games disseminate statistical information about baseball players; this statistical information is historical fact. See id. at 969; Gionfriddo, 94 Cal. App.4th at 410. Indeed, CBC's fantasy baseball games entertain participants based upon baseball history. See id. The fact that CBC derives a profit from its games does not preclude use of the players' names and playing records

---

[23]     Indeed, speech which is commercial in nature *may* under certain circumstances be protected under the First Amendment. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 500 (1996). The Supreme Court has held that it "is error to assume that commercial speech [is] entitled to no First Amendment protection or that it [is] without value in the marketplace of ideas." Id. at 496. However, "*the use of a persons's identity* for purely commercial purposes, like *advertising* goods or services or the use of a person's name or likeness on merchandise, is rarely protected." TCI, 110 S.W.3d at 373 (emphasis added) (citing Downing v. Abercrombie & Fitch, 265 F.3d 994, 1002 (9th Cir.2001); White v. Samsung Elec. Am., Inc., 971 F.2d 1395, 1397-99 (9th Cir.1992); Midler v. Ford Motor Co., 849 F.2d 460, 462-64 (9th Cir.1988)). Because the court finds above that the expression involved in CBC's fantasy games is not commercial speech, the court need not consider whether or not it is protected commercial speech. It is significant, nonetheless, that the court has also found that CBC's fantasy games do not use players' identities. See id.

from being protected speech under the First Amendment. See ETW, 332 F.3d at 924; Cardtoons, 95 F.3d at 970. Likewise, to the extent that CBC's fantasy baseball games are interactive, use of players' names and playing records in the context of the games is not precluded from First Amendment protection. See Interactive Digital Software, 329 F.3d at 957. CBC's use of players' names and playing records in the context of this case is not commercial speech. See Cardtoons, 95 F.3d at 970.

For these reasons the court finds that the First Amendment is applicable in the context of the right of publicity claim in the matter under consideration. See Zacchini, 433 U.S. at 567; New York Times Co., 376 U.S. at 265. The court further finds that CBC's use of the names and playing records of Major League baseball players in the context of the matter under consideration is speech which is protected under the First Amendment. See Interactive Digital Software, 329 F.3d at 957; Cartoons, 95 F.3d at 968-69.; ETW, 332 F.3d at 924; Gionfriddo, 94 Cal. App.4th at 410.

**2. Balancing CBC's First Amendment Right of Freedom of Expression with the Players' Right of Publicity**:

Once it is determined that the First Amendment is applicable in the context of a claim of the right of publicity, courts balance "the right to be protected from unauthorized publicity ... against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press.'" Gionfriddo, 94 Cal. App.4th at 409 (citations omitted). See also ETW, 332 F.3d at 931; TCI, 110 S.W.3d at 372. "There is an inherent tension between the right of publicity and the right of freedom of expression under the First Amendment. This tension becomes particularly acute when the person seeking to enforce the right is a famous ... athlete ... whose exploits, activities, accomplishments, and personal life are

subject to constant scrutiny and comment in the public media." ETW, 332 F.3d at 931.[24]  The

Restatement (Third) of Unfair Competition, §47, Comment c, notes that "'[t]he right of publicity as

recognized by statute and common law is fundamentally constrained by the public and constitutional

interest in freedom of expression.'" Id. at 930.  As a result of the tension between the right of

publicity and the First Amendment courts engage in "judicial line drawing." Id. at 931 ("'[A]t what

point does the right [of publicity] collide with the right of free expression guaranteed by the First

Amendment?'").[25]

    Upon considering whether the First Amendment takes precedence over a claimed right of

publicity, courts "balance the magnitude" of restricting the expression at issue "against the asserted

governmental interest in protecting" the right of publicity.  Cardtoons, 95 F.3d at 972.  As such this

court must examine the importance of CBC's right to freedom of expression and the consequences

of limiting that right. Id.  These consequences must be weighed against the effect of infringing on the

Major League baseball players' claimed right of publicity. Id.  See also Gionfriddo, 94 Cal. App.4th

at 410 (holding that the public interest in expression must be weighed against the plaintiff's economic

and noneconomic interests);  TCI, 110 S.W.3d at 372 (holding that it is appropriate to "weigh the

---

[24]     In ETW, 332 F.3d at 918, professional golfer Tiger Woods sued a sports artist
who created a painting entitled "'*The Masters of Augusta*' which commemorates Woods's victory
at the Masters Tournament in Augusta, Georgia, in 1997."

[25]     As noted by the court in ETW, 332 F.3d at 932, in White v. Samsung Electronics
America, Inc., 989 F.2d 1512, 1513, 1516 (9th Cir. 1993), the dissenting opinion "observed,
'[s]omething very dangerous is going on here. ... Overprotecting intellectual property is as
harmful as underprotecting it. Creativity is impossible without a rich public domain. ... Intellectual
property rights aren't free:  They're imposed at the expense of future creators and of the public at
large. ... This is why intellectual property law is full of careful balances between what's set aside
for the owner and what's left in the public domain for the rest of us.'"

state's interest in protecting a plaintiff's property right to the commercial value of his or her name and identity against the defendant's right to free speech") (citing <u>Zacchini</u>, 433 U.S. at 574-75). [26]

In order to apply a First Amendment balancing test this court must first identify the rights involved. <u>Gionfriddo</u>, 94 Cal. App.4th at 410. Upon identifying the interests at stake in <u>Zacchini</u> the Supreme Court considered that a goal of the right of publicity is to "focus[] on the right of the individual to reap the reward of his endeavors" and that this goal has "little to do with protecting feelings or reputation." 433 U.S. at 573. The Court further noted that, where a right to publicity is claimed, the individual's interest at issue is the right to receive the commercial benefit of the publication of allegedly damaging matter. <u>Id</u>. at 574. Upon concluding that the First Amendment did not take precedence over the right of publicity in the circumstances of <u>Zacchini,</u> the Court distinguished cases where a person's name is used "for purposes of trade or the incidental use of a name or picture by the press" from those which "*go[] to the heart of [a person's] ability to earn a*

---

[26]     In <u>TCI</u>, 110 S.W.3d at 374, the Missouri Supreme Court concluded that the First Amendment's right of free speech gave way to the right of publicity in the circumstances of that case because the defendants used Tony Twist's *name **and** identity for a commercial advantage*, because the defendants agreed that the use of Twist's *name **and** identity* "was not a parody or other expressive comment or a fictionalized account of the real Twist," because "the metaphorical reference to Twist ... ha[d] very little literary value compared to its commercial value," and because the use of the real Tony Twist's name and identity was "*predominantly a ploy to sell comic books* and related products rather than an artistic or literary expression." <u>Id</u>. at 374 (emphasis added). Because in the matter under consideration there is no exploitation of the identities of Major League baseball players, because the commercial value of players' identities is not at risk, and because there is no attempt by CBC to derive a commercial advantage over competitors in the fantasy game business by using the names and playing records of baseball players, these considerations of the Missouri court in <u>TCI</u> are not applicable.

Additionally, upon balancing the First Amendment and the right of publicity the Missouri Supreme Court in <u>TCI</u> applied a test which differed somewhat from that applied in <u>Cardtoons</u> and <u>Gionfriddo</u>. To the extent that the Missouri Supreme Court did not follow the analytic scheme of <u>Cardtoons</u>, this court is bound by federal authority in regard to constitutional issues and, therefore, must follow the analytic scheme applied by federal courts. <u>See</u>, <u>e.g.</u>, <u>de Llano v. Berglund</u>, 282 F.3d 1031, 1035 (8th Cir. 2002) ("[F]ederal law, not state law, ... determines what constitutes adequate procedural due process").

*living*" and which involve *"the very activity by which the entertainer acquired his reputation in the first place*." Id. at 576 (emphasis added). Clearly baseball players make a living playing baseball and may capitalize on their fame by endorsing products. In the matter under consideration, however, CBC's use of the names and playing records of Major League baseball players does not interfere with the players' ability to reap financial reward from these endeavors. As stated above, CBC's use of Major League baseball players' names and playing records in the circumstances of this case, therefore, does not go to the heart of the players' ability to earn a living.

Additionally, economic incentive is also justification for the right of publicity, particularly "in the field[] of sports."[27] Cardtoons, 95 F.3d at 973. In regard to the economic incentive element at stake in the right of publicity, the court in Cardtoons made the following observation which is applicable in the circumstances of the matter under consideration:

> [T]he additional *inducement for achievement* produced by publicity rights are often inconsequential because most celebrities with valuable commercial identities are already handsomely compensated. ... [F]or example, ...major league baseball players' salaries currently average over one million dollars per year, see Bill Brashler, *Booooooooooooooooo! Let's Hear It for Pampered, Preening, Overpaid Whiners: The Jocks*, Chi.Trib., July 28, 1996, (Magazine), at 12. Such figures suggest that "even without the right of publicity the rate of return to stardom in the entertainment and sports fields is probably high enough to bring forth a more than 'adequate' supply of creative effort and achievement." Madow, supra, at 210. In addition, even in the absence of publicity rights, celebrities would still be able to reap financial reward from authorized appearances and endorsements. The extra income generated by licensing one's identity does not provide a necessary inducement to enter and achieve in the realm of sports and entertainment. Thus, while publicity rights may provide some incentive for creativity and achievement, the magnitude and importance of that incentive has been exaggerated.

Id. at 974.

---

[27]    Noting that there are noneconomic justifications for the right of publicity, the court in Cardtoons, 95 F.3d at 975, did state that, "[p]rofessional athletes may be more responsible for their celebrity status [than other celebrities], however, because athletic success is fairly straightforwardly the result of an athlete's natural talent and dedication. Thus, baseball players may deserve to profit from the commercial value of their identities more than movie stars."

Upon examining the interests involved in the right of publicity, right of publicity cases involving the value of one's performance, such as Zacchini, must be distinguished from right of publicity cases involving the economic value of one's identity. Cardtoons, 95 F.3d at 973. The "incentive rationale is obviously more compelling in a right of performance case than in a more typical right of publicity case involving the appropriation of a celebrity's identity." Id. As the matter under consideration does not involve actual performances of the Major League baseball players but rather involves an allegation that CBC uses the players' identities, the incentive rationale is not compelling in the circumstances of the matter before this court. See id.

Another economic justification for the right of publicity is that it "promotes the efficient allocation of resources." Id. "The efficiency argument is most persuasive in the context of advertising, where repeated use of a celebrity's likeness to sell products may eventually diminish its commercial value. The argument is *not as persuasive*, however, when applied to *nonadvertising uses*." Id. at 975 (emphasis added). Significantly, the matter under consideration does not involve advertising.

Another "argument offered for rights of publicity is that they protect against consumer deception." Id. "The Lanham Act, [however,] already provides nationwide protection against false or misleading representations in connection with the sale of products." Id. (citations omitted). Thus, upon identifying the interests involved in the right of publicity a consideration is whether or not an alleged violation of this right is "likely to confuse or deceive customers." Id. In the circumstances of the matter before this court, CBC's use of the names and playing records of Major League baseball players does not suggest that the baseball players are making representations in regard to the sale of any product. As such, there is no likelihood of confusion or deception in the context of the matter before this court. Id.

It has been said that the right of publicity seeks to allow persons to enjoy the fruits of the goodwill which they have created. Id. at 975. Indeed, professional athletes have responsibility for their celebrity status based on their athletic achievements; their fame, however, is nonetheless "largely [a] creation of the media or the audience." Id. As such, balancing the scale in favor of the First Amendment in the circumstances of the matter before this court will not interfere with the ability of Major League baseball players to enjoy the fruits of their goodwill.

Another justification for the right of publicity includes the prevention of unjust enrichment. Id. at 976. In the circumstances of the matter under consideration, as CBC merely uses players' names and playing records which are already in the public domain, there is no possibility of unjust enrichment.

In regard to the rights of the public which countervail the interests involved in the right of publicity, the public has an "interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press." Gionfriddo 94 Cal. App.4th at 406.[28] Significant to the matter under consideration, the court in Gionfriddo held that "[t]he recitation and discussion of *factual data concerning the athletic*

---

[28] The court in Gionfriddo held:

[B]aseball fans have an abiding interest in the history of the game. The public has an enduring fascination in the records set by former players and in memorable moments from previous games. Statistics are kept on every aspect of the game imaginable. Those statistics and the records set throughout baseball's history are the standards by which the public measures the performance of today's players. The records and statistics remain of interest to the public because they provide context that allows fans to better appreciate (or deprecate) today's performances. Thus, the history of professional baseball is integral to the full understanding and enjoyment of the current game and its players.

In the uses challenged, Baseball is simply making historical facts available to the public through game programs, Web sites and video clips.

94 Cal. App.4th at 411 (citations omitted).

*performance* of these plaintiffs [who were retired professional baseball players] command *a substantial public interest*." Id.  See also Cardtoons, 95 F.3d at 973 (holding that the public has an interest in having access to factual data from baseball games).  This court has found, in the circumstances of this case, that CBC's use of the names and playing records of Major League baseball players in its fantasy baseball games informs and entertains about the history of baseball.  The public's interest in this suggests that the interests should be balanced in favor of the First Amendment rather than in favor of the right of publicity.

Also, it is significant in the matter before this court that if the players' right of publicity were to prevail over CBC's First Amendment right of freedom of expression, CBC's First Amendment right of freedom of expression would be totally extinguished; CBC would be unable to create and operate its fantasy games as the games cannot operate without the players' **names** *and* **playing records**.  To the extent that Advanced Media and the Players' Association contend that they do not object to the use of players' playing records but rather only to their names, such use by CBC is not realistic; the records mean nothing without the names. For example, it would be meaningless and useless to its game participants for CBC to report  that there were five home runs or ten singles in a baseball game without identifying the players who hit the home runs or singles.  As such, CBC would be out of business if it were precluded from using in its fantasy games either players' names or their names in conjunction with their playing records.  See e.g., ETW Corp., 332 F.3d at 938 ("Permitting [Tiger] Woods's right of publicity to trump [the defendant's] right of freedom of expression would extinguish [the defendant's] right to profit from his creative enterprise).

For the reasons more fully set forth above, after balancing the interests at issue regarding CBC's First Amendment right to freedom of expression and those involved in the players' claimed right of publicity the court finds, in the circumstances of this case, that CBC's First Amendment right

to freedom of expression prevails over the players' claimed right of publicity; none of the justifications for the right of publicity compel a finding that the First Amendment should not trump the right of publicity. See Cardtoons, 95 F.3d at 972-76; Gionfriddo, 94 Cal. App.4th at 410. The policy considerations and interests at risk upon restricting CBC's First Amendment right to freedom of expression outweigh the policy considerations and interests at risk in the players' claimed right of publicity. See Cardtoons, 95 F.3d at 972-76; Gionfriddo, 94 Cal. App.4th at 410.

In summation, the court finds that the First Amendment applies in the matter under consideration. See Zacchini, 433 U.S. at 567; New York Times, 376 U.S. at 265; ETW, 332 F.3d at 930. Moreover, assuming, arguendo, that the players have a right of publicity in their names and playing records and that CBC has and is violating the players' right of publicity, the court finds, in the circumstances of this case, that the players' right of publicity must give way to CBC's First Amendment right to freedom of expression.

## C.    Federal Copyright Law:

The court has found above that CBC has not and is not violating the players' claimed right of publicity. CBC and the Fantasy Sports Trade Association contend that, even if the players' have a right of publicity and this right was violated, federal copyright law preempts this right. Doc. 76 at 9; Doc. 105 at 21; Doc. 107; Doc. 124 at 6-7.

### 1.    Copyright Preemption:

The Copyright Act includes an express preemption provision which provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by [the Copyright Act]." 17 U.S.C. § 301(a). In National Car Rental System , Inc. v. Computer Associates International, Inc., 991 F.2d 426, 428-29 (8th Cir. 1993), the Eighth Circuit held that a state cause of action is preempted by the Copyright Act when

"(1) the work at issue is within the subject matter of copyright as defined in §§ 102 and 103 of the Copyright Act, and (2) the state law created right is equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106." (citing <u>Harper & Row, Publishers, Inc. v. Nation Enters.</u>, 723 F.2d 195, 200 (2d Cir.1983)). Thus, for copyright preemption to apply not only must the subject matter at issue be within the subject matter of copyright, but the right sought under state law must be equivalent to the exclusive rights under the scope of copyright.[29] <u>See e.g.</u>, <u>National Car Rental</u>, 991 F.2d at 428-29 (holding that while the computer program at issue was within the subject matter of copyright, the right sought under state law pursuant to a license was not equivalent to the exclusive rights under copyright; as such, copyright preemption did not apply). The court will, therefore, first consider whether the subject matter at issue in the matter under consideration is within the subject matter of copyright.

2.      **Subject Matter Element of Copyright Preemption:**

The Supreme Court has made it clear that "it is beyond dispute that compilations of facts are within the subject matter of copyright." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). The Court held in <u>Feist</u> that "copyright law seems to contemplate that compilations which consist exclusively of facts are potentially within its scope." <u>Id.</u>  On the other hand, it has been suggested that a person's *identity* or *persona* is not within the subject matter of copyright.  M. Nimmer, Nimmer on Copyright, §1.01[B][1][c] ("A persona is not a 'writing' of an 'author' within the meaning of the Copyright Clause...  A fortiori, it is not a 'work of authorship' under the Act ...

---

[29]      Article I, Sec. 8 of the Constitution provides that: "The Congress shall have Power ... to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

"The enactment of copyright legislation by Congress under" the Copyright and Patent Clause of the United States Constitution, Article I, § 8, clause 8, is based upon "the ground that the welfare of the public will be served and progress of science and useful arts will be promoted." <u>Sony Corp. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 429 n.10 (1984).

Because the content of the protected right does not fall within the subject matter of copyright, there is no categorical preemption of the right of publicity"). See also Downing, 265 F.3d at 1003-04; Landham v. Lewis Galoob Toys, Inc., 201 F.3d 619, 623 (6th Cir. 2000). This court has found above that CBC's use of the names and playing records of Major League baseball players in the context of this case does not involve the identity or persona of the players. However, clearly the baseball players' names as used in conjunction with their playing records in CBC's fantasy baseball games involve compilations of facts. Therefore, the court finds that Feist controls and will assume, arguendo, that the names and playing records of Major League baseball players in the context of this case is within the subject matter of copyright. Feist, 499 U.S. at 345.

### 3. Copyrightable Element of Preemption:

While the compilations of facts in this case are within the subject matter of copyright, if they do not meet the second prong of the test articulated in National Car Rental, 991 F.2d at 428-29, copyright preemption will not apply. See also National Basketball Ass'n v. Motorola, 105 F.3d 841, 847-48 (2d Cir. 1997) (holding that broadcasts of National Basketball Association games are copyrightable but that the games themselves are not copyrightable; as such copyright preemption did not apply). Thus, the court must determine whether the players' names and playing records as used by CBC are copyrightable. See Nat'l Car Rental, 991 F.2d at 428-29.

Facts themselves are not copyrightable because "[t]he *sine qua non* of copyright is originality." Feist, 499 U.S. at 345. As such, one "who accuses another of infringement" must prove "'originality, [] intellectual production, [] thought, and conception.'" Id. at 346-47 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884). "'No one may claim originality as to facts.'" Feist, 499 U.S. at 347 (quoting Nimmer, §2.11[A], p.2-157). "Facts, whether alone or as a

part of a compilation, are not original and therefore may not be copyrighted." [30] Id. at 350. Indeed, "[t]he most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.'" Id. at 345. "[F]acts do not owe their origin to an act of authorship. ... . The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." Id. at 347-48.

With these principles in mind the Supreme Court held in Feist, 499 U.S. at 361-62, that names, towns, and telephone numbers which are listed in a telephone directory are not copyrightable.[31] Likewise, census data "does not trigger copyright because these data are not

---

[30] The Court noted in Feist, 499 U.S. at 350-51, that "a factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. *In no event may copyright extend to the facts themselves.*" See also Kregos v. Associated Press, 937 F.2d 700, 703 (2d Cir. 1991).

[31] In support of its position that copyright preemption is applicable in the matter under consideration CBC relies on Baltimore Orioles, Inc. v. Major League Baseball Players Association, 805 F.2d 663, 676 (7th Cir. 1986). The Second Circuit in National Basketball Association v. Motorola, 105 F.3d 841, 846 (2d Cir. 1997), criticized the conclusion of the court in Baltimore Orioles that organized sporting events are themselves copyrightable because they contain "'the modest creativity required for copyright ability.'" The court in Motorola explained that the court in Baltimore Orioles was, perhaps, not suggesting that the underlying games, which can be played without being telecast, are copyrightable but only that the telecasts are copyrightable. In support of this interpretation of Baltimore Orioles, the Second Circuit, in Motorola, cited the Seventh Circuit's statement in Baltimore Orioles that "'even if the [p]layers' performances were not sufficiently creative, the [p]layers agree that the cameramen and director contribute creative labor to the telecasts.'" 105 F.3d at 846-47 (citing Baltimore Orioles, 805 F.2d at 669 n.7).

Further, as noted by the Fifth Circuit in Brown v. Ames, 201 F.3d 654, 659 (5th Cir. 2000), Baltimore Orioles "has been heavily criticized for holding that a baseball game is a protectable work of authorship simply because the performance was recorded on videotape that was itself copyrightable." (citing Nimmer, supra, §§ 1.01[B][1][c] and 2.09[F]; David E. Shipley, Three Strikes and They're Out at the Old Ball Game: Preemption of Performers' Rights of Publicity under the Copyright Act of 1976, 20 Ariz. St. L.J. 369, 384-88 (1988); Shelley Ross Saxer, Baltimore Orioles, Inc. v. Major League Baseball Players Association: The Right of Publicity in Game Performances and Federal Copyright Preemption, 36 U.C.L.A. L.Rev. 861, 870 (1989)).

Also, Morris Communications Corporation v. PGA Tour Inc., 117 F. Supp.2d 1322

'original' in the constitutional sense." Id. at 347-48 (citing Nimmer, § 2.03). Also, "scientific, historical, biographical, and news of the day" may not be copyrighted and are part of "the public domain available to every person." Id. at 348 (citation omitted). See also Motorola, 105 F.3d at 847-48 (holding that while broadcasts of basketball games are copyrightable, "the *scores* [of basketball games] represent *purely factual information* which any patron of an NBA game could acquire from the arena"; as such, "the underlying games are not" copyrightable) (emphasis added).[32]

This court has found above that the names and playing records of Major League Baseball players in the context of CBC's fantasy games are factual information which is otherwise available in the public domain, including newspaper box scores. As further noted above, newspaper box scores include players' hits, runs, doubles, triples, etc., which data is likewise provided by CBC. See CBC's Ex. 16E attached hereto. Moreover, as stated above, any person attending a baseball game has access to players' playing records as provided by CBC. CBC's use of the players' names in conjunction with the players' records involves "'purely factual information which any patron of [a baseball] game could acquire'" from watching a game or reading the newspaper. Motorola, 105 F.3d at 847 (quoting

_____

(M.D. Fla. 2000), is factually distinguishable from the matter under consideration because the statistics at issue in Morris were derived from *real-time* golf scores and were *time sensitive* while the playing records used by CBC are not time sensitive in the same sense. The court in Morris noted that the facts of Motorola were distinguishable from those in Morris because the defendants in Motorola "were able to gather their information simply by tuning in to a publicly-aired television or radio broadcast" while the plaintiff in Morris was not able to so easily access the information which it sought to publish. Id. at 1329.

[32]     Motorola involved Motorola's sale of subscriptions for a device known as a SportsTrax which displayed up to date information on the scores and statistics from the games of the National Basketball Association ("NBA") as the games were in progress. Motorola updated the information on a minute by minute basis thus allowing individuals to track games nationwide. To obtain the necessary statistics, Motorola used information provided by reporters employed by Sports Team Analysis and Tracking Systems, a company which monitored games via television and radio. In its lawsuit, the NBA alleged that SportsTrax violated its federal copyright in the underlying game by transmitting game statistics and that SportsTrax infringed the NBA's copyright in the broadcast of the basketball games. Motorola, 105 F.3d at 843.

district court decision, 939 F. Supp. at 104). Clearly, the names and playing records of Major League Baseball players as used by CBC in its fantasy baseball games are akin to the names, towns and telephone numbers in a phone book, to census data, and to news of the day. See Feist, 499 U.S. at 347-48. Most significantly, players' names and playing records as used in CBC's fantasy games do not involve the *sine qua non* of copyright - originality. See id. at 345. CBC's fantasy games use players' names and records from baseball games; CBC does not utilize the broadcasts of games themselves; CBC utilizes factual data from the underlying games.[33] See Motorola, 105 F.3d at 846. Indeed, CBC's fantasy games rely upon "only *facts*" which result from the playing of baseball games, "not the expression or description of the game." Id. (emphasis added). This court finds, therefore, that, while the players' names and playing records in the context of CBC's fantasy games are arguably within the subject matter of copyright, the players' names and playing records as used by CBC in its fantasy games are not copyrightable. As such, the court further finds that copyright preemption does

---

[33]    The court in Motorola, 105 F.3d at 846, recognized the practical problems which would arise were it to be determined that a sporting event itself was copyrightable. For example:

> If the inventor of the T-formation in football had been able to copyright it, the sport might have come to an end instead of prospering. Even where athletic preparation most resembles authorship--figure skating, gymnastics, and, some would uncharitably say, professional wrestling--a performer who conceives and executes a particularly graceful and difficult--or, in the case of wrestling, seemingly painful--acrobatic feat cannot copyright it without impairing the underlying competition in the future.

Id.

As further noted by the court in Motorola, 105 F.3d at 846, were games themselves copyrightable, problems would be created by the number of persons and entities who could claim joint ownership of the games. (citing 1 M. Nimmer & D. Nimmer, Nimmer on Copyright §2.09[F] at 2-170.1 (1996)) ("[T]he number of joint copyright owners would arguably include the league, the teams, the athletes, umpires, stadium workers and even fans, who all contribute to the 'work.'").

not apply in the matter under consideration.  See Feist, 499 U.S. at 361-62; Motorola, 105 F.3d at 847-48; Nat'l Car Rental, 991 F.2d at 428-29.

**D.     The 2002 License Agreement:**

    The Players Association and Advanced Media contend that by operating its fantasy games without a license CBC is violating the 2002 Agreement pursuant to which CBC agreed not to use in any way the rights which were the subject of the 2002 Agreement beyond the term of the Agreement. Doc. 45, Argument at 9-10; Doc. 111 at 27.

    Indeed, the 2002 Agreement stated that upon its termination CBC would have no right to use the Players' Rights.  As stated above, the 2002 Agreement warranted that the Players' Association had the authority to grant the licensed rights,  included a no-challenge provision in this regard, and defined Players' Rights to include players' names and playing records.[34]  CBC argues, however, that the Players' Association did not possess the right to license use of players' names in conjunction with the players' playing records in the context of CBC's fantasy games and that, therefore, the Players' Association does not have the right to enforce the 2002 Agreement's prohibition against CBC's use of the players' names and playing records without a license as well as its no-challenge provision. CBC further argues that these provisions are void as a matter of public policy. Doc. 111 at 36 (citing Lear, Inc. v. Adkins, 395 U.S. 653, 670 (1969); Idaho Potato Comm'n v. M & M Produce Farm & Sales, 335 F.3d 130, 136 (2d Cir. 2003); Idaho Potato Comm'n v. G & T Terminal Packaging, 425 F.3d 708, 715 (9th Cir. 2005)).

    First, to the extent the Players' Association and Advanced Media contend that CBC agreed not to use players' *identities* after the term of the 2002 Agreement, the court has found above that CBC has not and is not using players' identities in its fantasy games.  Moreover, the Players'

---

[34]     As noted above, the concept of Players' Rights is considerably broader than the issues which the parties have agreed and admitted are at issue in this case.

Association and Advanced Media have acknowledged, as noted above, that CBC can lawfully use players' playing records; they merely contend that CBC cannot use players' names. As emphasized many times by this court, players' records mean nothing without names; the records must be used in conjunction with players' names. Thus, the court will proceed to determine whether the provisions of the 2002 Agreement which CBC challenges are enforceable.

In regard to a license of a patent, "licensees may avoid further royalty payments, regardless of the provisions of their contract, once a third party proves that the patent is invalid." [35] Lear, 395 U.S. at 659, 667 (citation omitted). "Licensee estoppel"[36] is not applicable where the "strong federal policy favoring the full and free use of ideas in the public domain" outweighs the public interest against the "competing demands of patent and contract law." Id. at 675. As articulated by the Supreme Court in Lear:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

---

[35] The Court in Lear, 395 U.S. at 669, noted, however, that in a situation where parties enter into a license agreement prior to the issuance of a patent, "by accepting a license and paying royalties for a time, the licensee may have avoided the necessity of defending an expensive infringement action during the period when he may be least able to afford one. Second, the existence of an unchallenged patent may deter others from attempting to compete with the licensee."

[36] The Second Circuit in Idaho Potato Commission v. M&M Produce Farm & Sales, 335 F.3d 130, 135 (2d Cir. 2003), stated that the "general rule of licensee estoppel provides that when a licensee enters into an agreement to use the intellectual property of a licensor, the licensee effectively recognizes the validity of that property and is estopped from contesting its validity in future disputes."

Id. at 670-71.

Thus, Lear suggests that if the Players' Association, as a licensor, did not have the authority to license the players' names and playing records, the federal public policy of permitting and encouraging full and free competition of ideas takes precedence over the 2002 Agreement's prohibiting CBC's use of the names and playing records in the absence of a license.

In response to the argument that Lear is not applicable to the matter under consideration because it is a patent case, CBC argues, and this court agrees, that subsequent authority has extended Lear beyond the context of patent law. In M & M Produce, 335 F.3d at 131-32, the court considered the argument "that [a] no-challenge provision [in a license agreement] should not be enforced because it violate[d] the public policy embodied in the Lanham Act" and concluded that "'there can be no licensee estoppel involving a certification mark.'" Id. at 135 (citations omitted).[37] Upon considering the applicability of Lear, the court in M&M Produce, 335 F.3d at 137, noted that "Lear itself recognized that federal policy embodied in the law of *intellectual property* can trump even explicit contractual provisions. ... Lear makes clear that courts should weigh the federal policy embodied in the law of *intellectual property* against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest." (emphasis added).

Upon concluding that Lear was applicable, the Second Circuit held in M & M Produce, 335 F.3d at 136, that courts have "recognized that agreements related to *intellectual property* necessarily involve the public interest and have enforced such agreements only to the extent that enforcement

---

[37]     In State of Idaho Potato Commission v. G & T Terminal Packaging, 425 F.3d 708 (9th Cir. 2005), the court explained the difference between certification marks and trademarks. The Ninth Circuit noted that the policy behind *trademarks* is to "protect the public from confusion by accurately indicating the source of a product." Id. at 715. On the other hand, the policy behind *certification* marks is "to signify that a product or service has a certain characteristic." Id. Both M & M Produce, 335 F.3d 130, and G & T Terminal involved certification marks.

does not result in a public injury." (emphasis added) (citing <u>T & T Mfg. Co. v. A.T. Cross Co.</u>, 587 F.2d 533, 538 (1st Cir. 1978) ("[A]sk[ing] 'whether there is any significant harm to the public' before holding that a settlement agreement related to trademarks was enforceable"; <u>VISA Int'l Serv. Assn. v. Bankcard Holders of America</u>, 784 F.2d 1472, 1473 (9th Cir. 1986) ("'In general, a party entering into a settlement agreement with respect to a trademark will be held to his contract unless enforcement of the contract would result in injury to the public through confusion.'") (citation omitted). Thus, this court finds <u>M & M Produce</u> unequivocally extends <u>Lear</u> to cases involving intellectual property other than those involving patents and to licenses which include a no-challenge provision. <u>See also</u> <u>G & T Terminal Packaging</u>, 425 F.3d at 717-18 (holding that <u>M & M Produce</u> properly applied the <u>Lear</u> balancing test) (citing <u>MWS Wire Indus., Inc. v. King Nut Co.</u>, 797 F.2d 799, 803 (9th Cir. 1986); <u>VISA</u>, 784 F.2d at 1473; <u>T & T Mfg.</u>, 587 F.2d at 538; <u>Beer Nuts Inc. v. King Nut Co.</u>, 477 F.2d 326, 329 (6th Cir. 1973)).

Advanced Media argues that <u>Lear</u> is not applicable in the matter before this court because it involves the right of publicity which is a creature of state and not federal law; as such, the strong federal interest as expressed in patent matters is not present. Doc. 111 at 29. In <u>Zacchini</u>, 433 U.S. at 573, however, the Supreme Court held that in matters involving the right of publicity "the State's interest is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation." Thus, <u>Zacchini</u> establishes that <u>Lear</u> and its progeny are applicable to the matter under consideration where the players claim the right of publicity. As such, the public interests embodied in intellectual property law and those embodied in the right of publicity must be balanced to determine whether the challenged provisions of the 2002 Agreement should be enforced. <u>See</u> <u>Lear,</u> 395 U.S. at 674; <u>G & T Terminal Packaging,</u> 425 F.3d at 717-18; <u>M & M Produce</u>, 335 F.3d at 133.

Upon applying the <u>Lear</u> balancing test, the court must balance the concern for the demands of contract law against the concern for full and free use of ideas in the public domain. <u>See</u> <u>G & T Terminal Packaging,</u> 425 F.3d at 717-18; <u>M & M Produce,</u> 335 F.3d at 138. The interest in maintaining free competition is "akin to the public interest in the 'full and free use of ideas in the public domain' embodied in the patent laws." <u>Id.</u> at 139 (citation omitted). The court has addressed in detail above the significance of the free use of ideas in the public domain in regard to CBC's use of players' names and playing records. As such, the public interest in ensuring free competition is of great concern in the matter under consideration. As also discussed above, in the context of a claim of the right of publicity, the court has considered that the public has an interest in the dissemination of information. <u>See</u> <u>Gionfriddo</u>, 94 Cal. App.4th at 409. Indeed, CBC's fantasy games involve the dissemination of information. As stated above, players' names and playing records as used in CBC's fantasy games are in the public domain and the playing records are merely facts which are accessible to the general public. Moreover, the playing records represent baseball history.

This court has concluded above that the First Amendment is applicable to CBC's claim that it is not required to have a license to use players' names and playing records in its fantasy games and that the First Amendment, in fact, prevails over the players' claimed right of publicity. Were the court to give effect to the no-challenge provision in the 2002 Agreement and to the provision prohibiting CBC from using the players' names and playing records without a license, information which is otherwise readily accessible would be removed from the public domain and CBC's First Amendment

rights would be infringed.[38] As such, balancing the interests in favor of CBC would facilitate enforcement of the First Amendment.

This court has also noted above that Major League baseball players make a living from playing baseball and from endorsements; that they are well compensated for these endeavors; but that CBC's use of players' names and records in its fantasy games does not go to the heart of the players' ability to earn a living. See Cardtoons, 95 F.3d at 974. As such, balancing the interests in the matter under consideration in favor of CBC would have little impact on either the players' ability to earn a living or on their incentive for achievement. See id.

The court, therefore, finds that in the circumstances of this case "the strong federal policy favoring the full and free use of ideas in the public domain" as manifested in the laws of intellectual property prevails over the challenged contractual provisions in the 2002 Agreement. See M & M Produce, 335 F.3d at 137. As such, the court further finds that the no-challenge provision in the 2002 Agreement[39] and the provision which prohibits CBC from using players' names and/or playing records without acquiring a license are unenforceable and void as a matter of public policy. See Lear, 395

---

[38]     Aronson v. Quick Pencil Co., 440 U.S. 257 (1979), upon which the Players' Association relies in support of its position that the 2002 Agreement controls is clearly distinguishable from the matter under consideration as Aronson involved a *current* licensee who claimed that he was not bound by a license agreement because a patent application was rejected during the term of the license. Significantly, Aronson, unlike the matter under consideration, did not implicate the First Amendment or information which is in the public domain; Aronson involved a license for the manufacture and sale of a keyholder. The court in Aronson specifically noted that the contractual provision at issue did not "withdraw any idea from the public domain." Id. at 263. As noted above in the court's discussion of the right of publicity and in the court's discussion of the First Amendment, the contrary is true in the matter under consideration.

[39]     The court's finding in regard to the validity of the no-challenge provision in the 2002 Agreement addresses that provision only to the extent it addresses CBC's use of players' names and playing records.

U.S. at 674; G & T Terminal Packaging, 425 F.3d at 717-18; M & M Produce, 335 F.3d at 132-36; T & T Mfg., 587 F.2d at 538.

## IV.
## CONCLUSION

For the reasons more fully set forth above, the court finds that the undisputed facts establish that the players do not have a right of publicity in their names and playing records as used in CBC's fantasy games and that CBC has not violated the players' claimed right of publicity. The court further finds, alternatively, that even if the players have a claimed right of publicity, the First Amendment takes precedence over such a right. The court further finds that the undisputed facts establish that the names and playing records of Major League baseball players as used in CBC's fantasy games are not copyrightable and, therefore, federal copyright law does not preempt the players' claimed right of publicity. Additionally, the court finds that the no-challenge provision of the 2002 Agreement between CBC and the Players' Association and the provision of this Agreement which prohibits CBC from using players' names and playing records after the expiration of the Agreement are unenforceable based on public policy considerations. The court finds, therefore, that declaratory judgment should issue in CBC's favor. As such, the court will order the Players' Association and Advanced Media to refrain from interfering with CBC's fantasy games in the manner proscribed by this court's decision.

Accordingly,

**IT IS HEREBY ORDERED** that CBC's Motions for Summary Judgment are **GRANTED**; [Doc. 72, Doc.107]

**IT IS FURTHER ORDERED** that the Players' Association and Advanced Media not interfere with CBC's using players' names and playing records on its website and in its fantasy baseball games in the manner presented in this case;[40] [Doc. 1]

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by the Players' Association is **DENIED**; [Doc. 44]

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by Advanced Media is **DENIED**; [Doc.87]

**IT IS FURTHER ORDERED** that the counterclaims filed by Advanced Media are **DISMISSED**; [Doc. 7]

**IT IS FURTHER ORDERED** that the counterclaims filed by the Players' Association are **DISMISSED**; [Doc. 26]

**IT IS FURTHER ORDERED** that a separate judgment shall be entered which incorporates by reference this Memorandum Opinion.


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 8th day of August, 2006.

---

[40]     The court clarifies that this Memorandum Opinion only applies to those aspects of CBC's website which are before the court.





PLAINTIFF'S
EXHIBIT